Thank you, Chief Judge Murguia, and may it please the Court, Patrick Fooster on behalf of Petitioner Rafael Zaragoza Rios, I'd like to reserve three minutes for rebuttal. Legal errors prevented Zaragoza's application for cancellation of removal from even being considered on the merits, and also cut short his request for humanitarian relief. To roadmap where I'm headed, I have three buckets of arguments. First, the threat convictions don't involve moral turpitude under the categorical approach. Second, moral turpitude is not an intelligible principle under the non-delegation doctrine to begin with. And third, legal errors riddled the agency's consideration of asylum, withholding, and cat relief. Unless the Court wants to take me somewhere else first, I'll start with the categorical approach. An offense is a categorical match only if every possible way of getting convicted would involve moral turpitude. We can determine the possible ways of getting convicted either by looking at the breadth of the statutory language or looking at actual applications of the statute in practice. Here we know to a verifiable certainty that California courts were convicting people under Penal Code Section 422 for acts that didn't meet this court's definition of moral turpitude, which requires unequivocal threats of immediate harm. If that is true, and I have some questions about the California cases, which we can get to, but if that is true, doesn't that mean that our decision in Ladders-Singh was wrong? No, Your Honor, because Ladders-Singh addressed only one issue in the case, and it was looking at the statutory elements. Do they overlap with this court's definition of moral turpitude? Right, and we said that they did categorically. So if the elements of the – like you can't be convicted under the statute unless you have satisfied the elements of the statute, right? So if the elements of the statute are a categorical match for moral turpitude, then it cannot be the case that the statute is being applied to conduct that doesn't match moral turpitude. And conversely, if the statute is being applied in such a way, then we must have been wrong in Ladders-Singh when we said that the statute categorically constitutes moral turpitude, right? Well, this court was not wrong because no one had presented the argument that there were actual applications of the statute that fell outside the statutory elements. But there can't be applications of the statute that fall outside the statutory elements. I mean, the elements define what the statute is, and if it's being applied to conduct that isn't within the elements of the statute, then it's being applied to conduct that's not a crime. Yes, I agree with that in part, but this is how the Supreme Court saw it in Taylor. And I think before Taylor, there was some uncertainty about the relationship between when we look at the statutory elements, when we look at the applications. And I think before Taylor, it was largely thought that we look at the applications to better understand, even though it seems as though the statute is overbroad, it's actually being applied more narrowly. But what Justice Gorsuch said in Taylor is we look at first whether there was overlap. And we also ask whether State courts are applying to conduct in a special, non-generic way that would not fall within the relevant definition. So I think post-Taylor, there was no question that there were two different ways to show a categorical mismatch. And this Court has said that in Alfred, Keist, de France. So it is your view that it is an element of the California statute that you engage in conduct that puts a person in imminent fear of violence. That's an element of the California statute. But California courts apply the statute to conduct that doesn't do that. Aren't you saying that California is routinely either violating state law or violating the Due Process Clause or both? If California is convicting people of conduct that doesn't satisfy the elements of the criminal statute under which they're being convicted, that seems like a serious problem going on in California, doesn't it? I agree, and this is a rare case. So I want to be clear. In most examples, when you look at the statutory elements, you look at the way it's being applied, it should be complete overlap. So both paths will lead to the same destination. But this is a rare case where the statute was amended to require express threats, written or verbal. The California AG took the position that we can extend it more broadly to gestures. And in doing that, it swept up these ambiguous gestures that would not meet what this Court said was necessary. Right, but the California cases you cite seem to all include some verbal threat, unless I'm misreading them. What's the best case you have that's just a gesture? Ty-S. And in Ty-S, there were two girls. They had been kicked out of school for bullying or something of that nature. The director of the school drove up and just happened to see them on the side of the block. One girl said I had a verbal threat. She said I'm going to kill you, B, something of that nature. Isn't that a verbal threat? And then the other girl, all the other girl did was just throw up gang signs and whoop something behind them. And they said not just the one girl who had made the threat could be convicted, but the other girl too. But the Court said there was joint and concerted action by appellant and her companions. So shouldn't we read that as they're sort of imputing the verbal conduct to the accomplice, even though the accomplice did not personally say it? She was part of a concerted plan where somebody said it. I don't think that necessarily helps the government here if we do try to impute, because I'm not aware of any generic way of imputing the conduct in that nature. The Court did not say here we had a conspiracy. Hard to believe because the director just drove up and stopped next to him on the street. There was no aiding and abetting. So it is, I agree, it's loose language, concerted action. But there was nothing here that would be generic conspiracy, generic aiding and abetting. Let me just, taking a step back, where do you get the requirement that the sort of federal generic threatening conduct that would constitute a crime of moral turpitude has to be verbal? I'm not saying that only verbal threats can have it. But I'm saying that in Latter Singh, this Court identified three aspects of the statute that should have cabined it to morally turpitudinous threats. So the first one was that it had to be a threat to do something that would itself be morally turpitudinous. They said death, serious harm. It's a narrow category of speech that is likely to instill immediate fear in the person. And then you also had to have a specific intent. So my argument, and you can see this in the facts of the cases, is that when the courts extended it more broadly into the area of nonverbal threats, they were sweeping in conduct that didn't have those limiting features. Like here, throwing up gang signs behind someone else who had made a threat, which I don't think, I mean, I don't know what moral turpitude is. But it's kind of, I mean, all those cases include some verbal threat. They also included a gesture. So it's difficult for me to read that. The California courts were expanding the definition. There was uncertainty over exactly what it meant for something to be a verbal or a written threat. And we see that came to a head in Gonzalez. And Gonzalez was charged as a pure gestures case. It's the person outside the restaurant, car's driving away, does like a gun sign to the hood of the car. Ends up Court of Appeals saying that would be enough. Sent it back down for a trial. And it's only in 2017 that the California Supreme Court says, we've had this persistent practice of charging these gestures as threats. The statute requires an express one. But, I mean, gestures, I mean, both gestures and words, like, derive their meaning, not from, you know, like logical parsing of, you know, grammar and applications of definitions. Their meaning comes from social convention and context. And there are contexts in which a gesture can be an unambiguous threat of immediate violence. So you don't dispute that. I agree. So, like, why can't we read, I mean, both Thais and Gonzalez as saying essentially that, like, in those contexts, like, you know, sure, in some places a gang sign is just a gang sign. But in some situations a gang sign means, like, you know, I am going to kill you now because, like, this is the territory of my gang and you shouldn't be here. And that's essentially what was going on in those cases, or in Gonzalez at least. Right? I mean, I agree. It depends on how you read the actual facts. But I do want to be clear about something. And Chief Judge McGee, you had asked best case. And I think Nicanor Romero is a really good example of how this should work in practice. Judge Fletcher from 2008, where the court did three moves, which I think are all very helpful. One was it first said, we're looking at the statute, and the elements sound really bad just looking at the face of them. It was a child molestation statute. But then the court said, but in practice, California courts have applied it more broadly than the language would suggest. The second move was that the court said, we can look to unpublished decisions under Duenas-Alvarez to determine whether there was a realistic probability that the statute was being applied to conduct a generic test. And then the last move was to say, and this was a fight between Judge Fletcher and Judge Bybee. Judge Bybee was saying, well, we know there was a conviction. So the trier effect must have found that the person had done whatever was necessary to meet the elements. And what Judge Fletcher said was, no, that's a circular way of looking at it. It would basically take away the second path and lead it to never being able to provide any separate relief. And I do want to be clear. That portion of the opinion, just that last one, was joined by only Judge Fletcher. Judge Parkinson didn't disagree on the framework. He just disagreed on the application to that particular case. So I want to be clear about that. But I do think if you're looking for a road map of what maps onto this case, it would be Nicanor Romero. Do you want to get to the non-delegation? Yes, I'm happy to. And I know it's not every day that someone brings a non-delegation challenge. Even less frequently than someone that a court— Well, we heard two this week. Here's the second. So go ahead. But I did want to say that, you know, people always say one good year, two decisions in 1935. If there is a third violation out there, I think it would be this statute. There was no other statute which has been under such sustained criticism for so long that has a track record like this one. And that is a standard that really has no objective determinant limits. We're starting with moral turpitude. And I don't think there's any way for the public or Congress to be able to tell whether the statute is being properly applied. We've had this game of really starting in when it was first introduced to immigration law in the late 1890s, this game of hopscotch where the agency just sees, can I take you to this offense? And then the courts are enlisted in making these moral determinations about whether the agency has drifted too far from moral turpitude. And as we point out in the brief, if there is any core, it really is fraud offenses, certain offenses involving sexual impropriety. I think if there was a way to save the statute, it would be going down that path. But there's no argument that under some term of art or historical meaning that the government invokes that this sort of threat offense would be swept in. And I do want to point out what I think is the biggest problem about moral turpitude remaining on the books. Congress has addressed lots of different offenses and said that they make you subject to removal, that they disqualify you from seeking cancellation of removal. Congress has even done that for threat offenses. Aggravated felony picks up crime of violence if there's an element of threat of use of force. But Congress said when they addressed this specific question, only if you have a sentence of at least a year. We don't have that here. It was a 180-day sentence. So we have cases which are falling outside the categories they were designed to be in, and then moral turpitude is just sweeping everything in without any real intelligible principle to determine what the outer limits are. I mean, you refer to Justice Jackson's observations about the problems with moral turpitude, which I think are well taken, like most of his observations were. But that was 80 years ago, and the Supreme Court has not seen fit to do anything based on that in the 80 years since then. So shouldn't we view – there's a lot of water under this bridge, right? Shouldn't we view that as a sort of – I don't know if the Supreme Court has explicitly ever said, like, this is not a non-delegation problem, but they have strongly suggested that it isn't one because they keep on doing it. Why is it up to us to tell them to stop? I think the government would agree that there is no Supreme Court precedent, no precedent from this court on the non-delegation question. And I think there are ways that the vagueness challenges – and, of course, we have our problems with that. We're preserving that for later. But there are ways that the vagueness challenges could have been rejected that would have effectively put the nail in the coffin for the non-delegation claim. It would say the statute provides fair notice, the statute inhibits arbitrary enforcement. But that's not what this court said. This court said that the administrative and judicial applications of the statute provide fair notice about how it's going to be applied in future cases. And that's not the solution to a non-delegation problem. That's the source of it. It's that courts and the executive agency have been exercising this legislative power to sort of extend the statute over and over and over again. So I think I'd agree with you in theory in certain cases, but I think this one is actually one that points up that there could be a non-delegation problem even without a – So you think the Fourth Circuit got it wrong? Yes. And it's not often I say that about Judge Wilkinson, but if I want to point out the main thing – I mean, one, consumers' research wasn't yet on the book. And I do think that when you read the transition from Gundy to consumers' research, that the Supreme Court is starting to tighten up the standard even more, brought in one of the Gundy dissenters into the consumers' research majority. And the other thing is that Judge Wilkinson looked at just the statutory term in the abstract. The court has upheld things like public interest, fair and reasonable. But what the Supreme Court said is that we don't take those terms in the abstract. Public interest does not mean do whatever you think is best for the public. That in a particular statutory context, it can have a narrower meaning. Like NBC, when you're issuing radio licenses, consider whether issuing this license will increase the options available to the listening public. But here you go to context, and it's not like moral turpitude has any more definite meaning when you look at the other offenses as listed next to the way that it's being used in the statutory scheme. And if there are no more questions on non-delegation, I just wanted to hit on one of the arguments for humanitarian relief. We stand by what we said in the brief. I think the asylum is probably the cleanest legal error because we have a decision from this court saying, legal rule, you consider harm to parents that are witnessed by the child. That is personal persecution to the child. And what the IJ said is, no, I'm going to weed that information out instead of weighing it because it wasn't closely tied to Zaragoza when he was a child. I think that's just a clear legal error under Hernandez-Ortiz. Unless there are any further questions. Thank you. Thank you. Good morning. May it please the court. Robert Tennyson for the government. Let me start back with the whether or not this offense, 422 of the California Penal Code, is a crime involving moral turpitude. This court has said it has. Ladder saying. And despite what petitioner has argued here, neither Miller V. Gammy, which talks about overruling statutes, or cure Luke, which discusses, I guess, underruling statutes where this court hasn't addressed an issue. Allow this court to be to revisit Ladder saying there's no case by the California Supreme Court that has changed the course of the law. And in this case, in Ladder saying this court wasn't just deciding some, you know, this wasn't deciding whether or not this was a crime involving moral turpitude. It wasn't just sort of assumed or put off to the side or set the analysis set aside. The court specifically addressed whether or not Section 422 of the California Penal Code is crime involving moral turpitude. Can I ask you a question? Sure. Is it your position that if the litigants in Ladder saying had raised the argument that the petitioners raising here in this case regarding the realistic probability, the Duenas Alvarez argument, the Ladder saying panel could have addressed it? Oh, yes, they could have raised it. But it wasn't, but all sorts of arguments can be raised by petitioners in cases with regard to specific issues. Would they have reached it? Would they have been able to reach it, that panel? Would they have been able to reach the issue had they come in and said, oh, there are these state law cases. The realistic, yeah, the state law cases. And the realistic probability requires it to be read this way. Right. This court could have addressed it head on. Absolutely. So I guess that's why I'm trying to understand why if the argument was never raised before Ladder saying why can't we raise it? Why can't it be raised today and considered today, especially in light of Taylor? Right. One, I don't think Taylor changes the compass. Taylor is no more than just an extension of Duenas Alvarez. It's the same thing. That's one. Two, and I don't want to belabor the point on whether or not this court can reconsider it. But that way, if you were to do that, anytime someone comes up with a new argument or a new reason to reconsider an issue that is decided where you don't have a clearly irreconcilable decision in the midst of it. This court, the prior panel plural, essentially means very little. Because issues once decided are binding, and they should be, unless either a, I guess what, a future court has made a decision that is clear, a higher court like an en banc panel. I'm just trying to figure out our case, our case law here, because you argue that facial overbreath and realistic probability are the same thing. They are large, because what the realistic probability, I don't want to say that. You can have instances in which someone says that the statute, take Duenas Alvarez itself, right? The petitioner in that case said, look, the statute with aiding and abetting, yes, on its face, the facial statute doesn't look like it goes that, doesn't look like it captures activities outside the generic defense. But the state goes and applies this statute in ways that does. It's interpreting the statute in a way that operates in that fashion. I'm just trying to square that with the language from the United States. I think it's Keist, De France, and then Alfred versus Garland, where we explain that there are two paths or two ways to compare a state statute with the generic standard under the categorical approach. And I just don't know, I may be the only one confused by that, because we set out that there's two paths, and yet it seems like we're cutting it off here. And I just need help in understanding that argument. So let me go back to Latter Singh. I mean, one of the things about that second realistic probability path is that, and this is Taylor, this is subsequent to Taylor, is that you look at cases to determine how the courts in the state have construed the statute. It's not how it's been prosecuted. It's not how it's been reported on the reviews. This court is very much, should be, and is avoiding just looking at facts in the air. Rather, what you're looking at is how the provisions have been construed to reach particular results. And in that regard, that realistic probability test is essentially saying, look, we can look at the statute and see what the terms say and see whether they're overbroad. Or two, we look at the court cases and we look at the decisions and how it's been construed. And in Latter Singh, this court looked at the cases that had been decided by the California Supreme Court with regard to, one, whether or not the kind of threat was a threat to do something that would itself be a crime involving moral turpitude. Two, whether or not the threat had the kind of the immediacy to cause the fear, the threat from the – the harm from the fear. And whether or not it did, and again, it discussed the particular cases. And three, whether or not it had the relevant specific evil intent. This court looked to all of those things. It's not like it took the statute in a vacuum. So with regard to all of this court's cases post-Taylor on how this analysis goes, this court has done it, has done exactly what is required. But even if it hadn't, again, what the petitioner is pointing out is actually kind of beside the point. Whether or not those threats are verbal or nonverbal doesn't matter. This court can go back and look at Latter Singh and say Latter Singh was right. Even if nonverbal threats were permissible under, I guess what, pre-Gonzalez California law, you still have a crime involving moral turpitude because you still have the immediacy of the threats. You still have someone being put in fear, and it is – that fear is reasonable, and that's all you need. Also, I would further indicate that none of the cases the petitioner cites to involve purely nonverbal threats, even Ty S. In that case, not only do you have Ty S.'s friend making an express verbal threat, you have – it's the case that not only does Ty S. throw a gang sign but is yelling. And we don't know what she is saying in the yelling, but we know there is verbal activity going on. So however you put it, there is some – the threats are immediate, and there is some verbal component to it. Now, let's move on to the – unless this court has any further questions about that issue, let's move on to, I guess, what? The non-delegation issue. Under FCC v. Consumer Research, the Supreme Court set out the intelligible principle analysis, the non-delegation analysis. First, it said, look, we analyze these things differently with regard to whether or not they're comprehensive, broad in scope. The kind of delegation is – has to do with the national economy on one hand, or it has to do with something small like here, whether or not one manages to get to a discretionary determination by an immigration judge that you're allowed to have your application for cancellation granted or denied. Two, it's relevant whether or not you can figure out what the government's policy was behind the crime involving moral turpitude. In the cancellation context, that is whether or not we grant relief to people who have committed really bad crimes. And moral turpitude is a way of getting at that point. I've always been troubled by that, and I've written a number of moral turpitude decisions, but I must confess over time it seems like moral turpitude is in the eye of the beholder, and that is the problem. I mean – Because basically you could argue that any crime in a certain extent is a crime of moral turpitude. Right, but I mean let's take this case. Let's take Ladder-Singh, and let's compare it with Flores-Vazquez. This court was able to draw a line between criminal threats on the one hand under California Penal Code 422 that were sufficiently immediate and involved the kinds of, I guess, what? Directedness towards crimes that themselves would be crimes involving moral turpitude on the one hand. And what was the, I guess, the Oregon menacing statute where it said no, none of this was the case, and therefore it's not a crime involving moral turpitude. This court can do it. And we have, but I've been saying that's the troublesome part of a pretty ambiguous phrase in terms of just saying all right, we're going to draw a bunch of lines, which sort of indicates that maybe there is a delegation. So let me respond with two things. One, I think that we do have some general rules that are valuable for the delegation. I think two, I would say it's an errant delegation. And three, this is a weird case where maybe it doesn't matter. This is cancellation. This is a case where even if we were to interlineate the moral turpitude grounds, immigration judge can just up and say, yeah, you've done bad stuff. I'm not giving you cancellation, which means that the non-delegation problem is of no moment here really. Well, I mean there is a difference between being ineligible for a discretionary benefit and being eligible for it even if you might ultimately not get the discretionary benefit, right? So I mean if we thought that Congress had passed a statute that really had no – I mean if Congress passed a statute that had no principle to it at all, what's your authority for the proposition that that would be saved from a delegation challenge just because the only thing that turned on it was the availability of discretionary relief? Right. I think at the bottom, there's been no contest that this sort of discretion is – discretionary grant of cancellation or denial is an issue. And in fact, there are – this court has no jurisdiction to address whether or not that's an issue. I guess you can raise a constitutional problem in that context. We can address eligibility. But if we can just address eligibility, I mean it's like if you already have an amorphous blob. If you're cutting Jell-O, it doesn't matter. I think that's probably sort of the visual metaphor I have. But I mean I guess I'm not sure I understand the – well, either the Jell-O part but setting that aside. The – I had thought that the point of the delegation, the non-delegation doctrine such as it is, is that the Article I vesting clause says Congress has to exercise legislative powers. And determining whether somebody is or is not eligible for discretionary relief seems like an exercise of legislative power. And if we think that Congress has not done that because it hasn't provided any intelligible principle, then I don't see how we could avoid the conclusion that it had delegated its legislative power to whoever was going to be making that determination impermissibly. So let's take your point as given. I mean let's say that the fact that it's within the context of something that's just a wholesale delegation shouldn't limit or shouldn't affect the consideration of non-delegation with regard to the eligibility factors. Even still, this is again a very narrow issue, and Congress has said in narrower cases, non-delegation is sort of less of an issue when you – than in some broad delegations. So what Congress has done is it's delegated a very narrow sliver of power, and that is to determine eligibility for people who have criminal – who are criminal aliens as to whether or not they get cancellation relief. That's it. Do you think we need to agree with that principle to say that moral turpitude is an intelligible principle? I think that you – I think that to say it's an intelligible principle, you have to look at how narrow it is and also how these – how in the 80 years since DeGeorge, the courts have construed this and given it concrete meaning. Even if there is some – even if that meaning is this court has to draw lines as it goes along, this court can draw lines. It has a way in which it does draw lines. It draws lines based upon the intent of the petitioner or the heinousness of the conduct or some combination of the two. So in that regard, I think that it is definitely intelligible enough for the low standard that's set for the non-delegation doctrine. Briefly, let me go to the asylum issue unless this court has any other questions about non-delegation. On asylum, one of the things that petitioner counsel attempts to sort of argue is that any harm to a parent that occurs within the presence of the child is natively part of the persecution that the child faces. But the thing is if you look at Hernandez-Ortiz and even the cases following on with that. The reason why the parent is being persecuted or the child is being – or the child is being persecuted with the parent is that they share a – there is a protected ground that is shared among them. Here, that's not the case because we have no idea why the father was being fought and whether there was any shared intention or mental state or directedness of the persecutors when it came to those fights. Whether the son was pushed aside to keep him out of the fight and whether the father was being attacked for, we don't know what. And so as a result, under Walkery or Sharma or any of these cases, you do have to have that binding element, that glue to find persecution. That's not here. If the court has no further questions for me, the government will rest. Thank you. I think you are out of time, so I'm just going to give you a minute. Okay. Thank you, Your Honor, and I'll be quick. Three quick points. So the first thing I heard was that the government said that the issue could have been but wasn't raised under the categorical approach in Ladder-Singh. We know from this court's cases it has to be squarely addressed to take it off the table for a future litigant. Taylor made that clear. As Chief Judge Morgilla pointed out, there's two distinct theories, and the second one has never been decided by this court. And I also want to point out for Ty S., the angry utterance or outburst. I think Flores-Vasquez, page 929, is a good example of digging into facts and in this court saying they didn't rise to the level necessary under Ladder-Singh. Second, on non-delegation, I heard the government say the policy was really bad crimes. I think we all agree that if Congress passed a statute tomorrow that said you're ineligible for this benefit or you're removable if you've done a really bad crime, I think we'd all agree that's not an intelligible principle. And that is as far as the government is able to get with moral turpitude. I guess I'm not sure I would agree that really bad crime is less intelligible than requisite to protect the public health or promote the public interest, convenience, and necessity. Why do you say that? Well, I think it's the eye of the beholder problem that Judge Thomas pointed out. We all disagree about what really bad crimes are, especially here. We're not talking really bad crimes like the worst 10 or something. We're really talking about the expansion into shoplifting, DUI, but only for driving without a license. So when the government says really bad crime, it just really means a crime that is bad in the way that all crimes are bad to some extent. So they don't really mean really bad murder, rape, something like that. And quickly on the Jell-O argument, I don't think that it's an answer to say that there is discretion at a later stage in the process. If Congress said it's a crime if you do something bad, you wouldn't be able to say, oh, but the government will exercise prosecutorial discretion in choosing who did the bad thing. That discretion cannot cure an earlier violation. And really quickly, just on the last point, all I heard from the government on asylum was nexus. AR6, Note 3, the BIA did not decide nexus. Under Chenery, this court is not able to reach out, and there's no exception to the Chenery principle that would allow this court not to remand on that issue. So that is the government's one answer. They did decide nexus in terms of fear of future persecution, didn't they? Yes, only in terms of— What does that mean in this context? And not on past persecution. AR6, Note 3, the BIA notes that issue had not been decided. There's no exception. I've read the footnotes. Okay. Well, if there are no further questions, thank you for your time. Thank you. Thank you very much, Mr. Pfister. Mr. Tennyson, appreciate your argument presentations here today. The case of Rafael Zaragoza-Rios v. Pamela Bondi is now submitted.
judges: MURGUIA, THOMAS, MILLER